CL

<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

NUR RAHEEM PACK,                    :
                                    :    Civil Action No. 03-3603 (JAP)
            Petitioner,             :
                                    :
      v.                            :    **OPINION**
                                    :
ROY L. HENDRICKS, et al.,           :
                                    :
            Respondents.            :

**APPEARANCES:**

Petitioner <u>pro se</u>              Counsel for Respondents
Nur Raheem Pack                     Nancy A. Hulett, Esquire
New Jersey State Prison             Deputy Attorney General
No. 290223/981066B                  Division of Criminal Justice
P.O. Box 861                        Appellate Bureau
Trenton, NJ 08625                   P.O. Box 086
                                    Trenton, NJ 08625

**PISANO**, District Judge

      Petitioner Nur Raheem Pack, a prisoner currently confined at
New Jersey State Prison, has submitted a petition for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254.  The respondents are
Administrator Roy L. Hendricks and the Attorney General of New
Jersey.

      For the reasons stated herein, the Petition must be denied.

# I.  BACKGROUND

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> Defendant Nur Raheem Pack was charged with the shooting death of Whitney Reginald Gist and the wounding of Michael Dennis.  At the time of the offense, defendant was seventeen years old.  Pursuant to N.J.S.A. 2A:4A-27, the Family Part waived jurisdiction and he was tried as an adult.  He now appeals from his convictions after a jury trial of: murder, N.J.S.A. 2C:11-3a(1) and (2); third degree aggravated assault, N.J.S.A. 2C:12-1b(2); unlawful possession of a handgun, N.J.S.A. 2C:58-4; and possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a. ...

> The proofs presented by the State can be summarized as follows.  Defendant and his friends "hung out" at the corner of Union and Jackson Avenues in Jersey City.  Gist and Dennis were high school friends and they "hung out" at the corner of Randolph and Carteret Streets in Jersey City.  The Union Avenue group does not get along with the Randolph Avenue group.

> Dennis testified that on July 8, 1995, "Cheese," one of the members of the Randolph Avenue group, had a fight with Tyrone Fields from the Union Avenue group. Later that day, at approximately 10:00 p.m., Gist, Dennis and their friends, Isiah Patterson, Jason Thomas, Gerald Jenkins, Raymond Dixon, and Cornelius Clay, decided to go to the Blue Crab bar.  The group traveled in three cars: Gist drove his Acura with Dennis as his passenger; Thomas drove his gold Dodge Omni with Patterson and Jenkins as passengers; and Dixon drove his Sterling with Clay as his passenger.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

After "bar hopping" for some time at several local bars, Dixon and Clay left in the Sterling.  The others decided to go to another tavern.  The two cars headed down Jackson Avenue with Gist's Acura leading the way.

At the intersection of Jackson and Union, both cars stopped at a red light.  It was now sometime between 12:30 a.m. and 1:00 a.m. on July 9, 1997. According to the testimony of Dennis, Jenkins and Thomas, they saw defendant sitting on a bicycle at the corner.  Defendant pulled a handgun from his waist.  He fired a shot that shattered the Acura's driver's side window.  As he approached the Acura, defendant continued firing.  Dennis, who was in the passenger seat, ducked to protect himself.  Defendant fired approximately nine shots into the Acura.  No shots were fired in the direction of the Omni.  Gist and Dennis were hit.  After firing the handgun, defendant ran from the scene.  According to Jenkins, defendant turned around and smiled.

Gist attempted to drive the Acura away from the scene, but could not control the car.  Dennis moved Gist to the passenger side and drove to the hospital. Thomas followed in the Omni.  Gist sustained five gunshot wounds with severe damage to his abdomen and right arm.  He died at the hospital several hours later.  Dennis sustained a gunshot wound to his leg. One of his arteries was damaged and he required surgery.  Dennis, Jenkins and Thomas identified defendant as the shooter to the investigating police officers.

The day after the shooting, defendant, accompanied by his mother, turned himself in to police.  After receiving <u>Miranda</u> warnings and signing a rights waiver, defendant gave a statement.  Defendant claimed that at about 6:00 p.m. on July 8, he saw Gist and "another kid" driving around in a car as he rode his bicycle. Defendant claimed that Gist slowed down as if he was going to "try to do something."  Defendant claimed that he had seen both the Acura and the Omni previously because the cars had come through shooting.  Defendant continued riding around on his bike, but he heard from others that an Omni and a Sterling were out looking for him.

3

Defendant discussed how he had previous fights and arguments with the Randolph Avenue group.  Defendant thought "they" were out to stab him, shoot him or hit him in the head with a baseball bat.  Specifically, defendant discussed one incident that took place about three weeks before the murder in which he was chased while riding his bicycle.  Defendant stated that "they" chased him and "somebody else" on a bike.

On July 9, defendant claimed that as he stood at Union and Jackson, the Acura and the Omni stopped at the light and he saw "something come out, like a gun ... out the back window of the Omni."  Defendant admitted that he was not sure what came out of the Omni's window.  He also claimed that the cars had tinted windows, but that he saw Gist in the Acura.

Defendant then grabbed a handgun from the grass a few feet away from where he was standing.  He fired the gun in the direction of the cars and the Omni came toward him.  He had no knowledge of how many bullets were fired.  After firing, defendant walked away but could not remember what he did with the gun.  Defendant stated, "[The gun] just disappeared, the gun is done."  In the view of defendant, he did what he did because "[t]hey pulled out guns on us before, ... so I was just scared for my life, and I did what I did to save myself, but if I wouldn't have did it, they probably would have killed me."

At trial, defendant did not testify.  He relied on his statement to show that he acted in self-defense.  Jeffrey Shurn, defendant's friend and part of the Union Avenue group testified regarding an incident that occurred several days before the shooting.  In that incident, Shurn and defendant were chased by a Volkswagen Jetta.  This is the same chase to which defendant's statement alluded.  Shurn and defendant rode off on their bicycles when the Jetta approached them traveling the wrong way on a one way street.  During the chase, Shurn and defendant were separated and Shurn saw the occupants "jump out" of the Jetta.  One passenger was carrying a gun.  Although they managed to elude their pursuers that night, Shurn claimed he heard the voice of Joe Vaughn a member of the Randolph Avenue group.

(Resp. Ex. 6, Appellate Division Opinion dated Feb. 3, 2000.)

4

Petitioner's convictions were affirmed on direct appeal. (Resp. Ex. 6, Appellate Division, Feb. 3, 2000.) On May 11, 2000, the Supreme Court of New Jersey denied certification. (Resp. Ex. 9.)

Petitioner moved for post-conviction relief. The trial court denied relief without a full evidentiary hearing. (Resp. Exs. 10, 13, 36.) The Superior Court of New Jersey, Appellate Division, affirmed the denial of relief. (Resp. Ex. 18.) On April 28, 2003, the Supreme Court of New Jersey denied certification. (Resp. Ex. 21.) This Petition followed.

## II.   28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter).  Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application

6

of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits

notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).]

### III.  ANALYSIS

### A.  Jury Instructions

Petitioner asserts that he was deprived of a fair trial by the trial court's failure to instruct the jury on Passion/Provocation Manslaughter and Imperfect Self-Defense.

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing
> instruction by itself so infected the entire trial that
> the resulting conviction violates due process."  It is
> well established that the instruction "may not be

judged in artificial isolation," but must be considered
in the context of the instructions as a whole and the
trial record.  In addition, in reviewing an ambiguous
instruction ..., we inquire "whether there is a
reasonable likelihood that the jury has applied the
challenged instruction in a way" that violates the
Constitution.  And we also bear in mind our previous
admonition that we "have defined the category of
infractions that violate 'fundamental fairness' very
narrowly."  "Beyond the specific guarantees enumerated
in the Bill of Rights, the Due Process Clause has
limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations

omitted).  Thus, the Due Process Clause is violated only where

"the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state

law."  Smith v. Horn, 120 F.3d 400, 416 (1997).  See also In re

Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause

protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the

crime with which he is charged"); Sandstrom v. Montana, 442 U.S.

510, 523 (1979) (jury instructions that suggest a jury may

convict without proving each element of a crime beyond a

reasonable doubt violate the constitutional rights of the

accused).

     Where such a constitutional error has occurred, it is

subject to "harmless error" analysis.  Smith v. Horn, 120 F.3d at

416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999).  "[I]f

the [federal habeas] court concludes from the record that the

error had a 'substantial and injurious effect or influence' on

the verdict, or if it is in 'grave doubt' whether that is so, the
error cannot be deemed harmless." Id. at 418 (citing California
v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged
instruction,

> a single instruction to a jury may not be judged in
> artificial isolation, but must be viewed in the context
> of the overall charge.  If the charge as a whole is
> ambiguous, the question is whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way that violates the
> Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal

quotations and citations omitted).

1.    Passion/Provocation Manslaughter

On direct appeal, the Appellate Division rejected

Petitioner's argument that he was entitled to an instruction on

passion/provocation manslaughter.

> Defendant first contends that there was adequate
> evidence in the record to require the judge sua sponte
> to give a passion/provocation manslaughter charge.  We
> disagree.  It is well-settled that a judge has a duty
> "to charge the applicable law to the jury based upon
> the facts regardless of what requests counsel may
> make."  State v. Powell, 84 N.J. 305, 318 (1980).  If
> the facts and evidence indicate a possibility that
> instead of murder, "the crime was manslaughter based
> upon either provocation/passion or imperfect self-
> defense," the trial judge is obliged to charge the jury
> as such.  Ibid.; see also State v. Choice, 98 N.J. 295,
> 299 (1985).
>
> N.J.S.A. 2C:11-4b(2) defines passion/provocation
> manslaughter as a "[h]omicide which would otherwise be
> murder under section 2C:11-3 [that] is committed in the
> heat of passion resulting from a reasonable
> provocation."  See State v. Grunow, 102 N.J. 133, 138-
> 40 (1986).  The test for passion/provocation is an

objective one.  State v. Mauricio, 117 N.J. 402, 411
(1990); see also State v. Pratt, 226 N.J. Super. 307,
317 (App. Div. 1988).  There are four elements
necessary to demonstrate passion/provocation
manslaughter: 1) adequate provocation; 2) lack of time
to cool off between provocation and slaying; 3)
defendant must have actually been provoked; and, 4)
defendant must not have actually cooled off before the
slaying.  The provocation must be sufficient to arouse
the passions of an ordinary person beyond the power of
his control.  State v. King, 37 N.J. 285, 301-02
(1962).  However, "a course of ill-treatment" rather
than a single event can constitute adequate
provocation.  State v. Guido, 40 N.J. 191, 211 (1963).

Here, defendant argues that his confession and the
testimony of Dennis and Shurn detail "a history of
animosity and armed encounters between [him] and Gist
and their respective cohorts."  Additionally, defendant
alleged in his statement that he saw what appeared to
be a gun protruding from the rear window of the second
car.

We conclude that the evidence simply does not
establish the element of adequate provocation.
Defendant admitted in his statement that nothing was
said by any occupant of the Acura or Omni before he
started firing.  Although there were references to
ongoing animosity and fights with members of the
Randolph Avenue group, there is not one iota of
testimony that immediately prior to the shooting and
before defendant had an opportunity to cool off, he was
provoked.  In essence, defendant attempted to justify
his actions on the grounds of self-defense not
passion/provocation.

(Resp. Ex. 6 at 6-8.)

Here, the state courts determined that there was no error of
state law in the jury instructions.  The facts as recited by the
Appellate Division establish that Petitioner was not deprived of
a fair trial by the failure to give a jury instruction on
passion/provocation manslaughter.  The decision of the Appellate

Division was not contrary to nor an unreasonable application of governing federal law. Petitioner is not entitled to relief on this claim.

2.   Imperfect Self-Defense

The Appellate Division also rejected Petitioner's claim that he was entitled to an instruction on imperfect self-defense.[2]

> Defendant also contends that when the judge instructed the jury as to aggravated and reckless manslaughter, he failed to explain how the jury could find manslaughter in this particular case. Defendant contends that the judge instructed the jury on "the abstract legal concept of recklessness," but that a more specific instruction regarding defendant's honest yet unreasonable belief of the need for deadly force was needed in order to conform with the holding of State v. Bowens, 108 N.J. 622 (1987).

> In New Jersey, if a jury charge, read as a whole, adequately sets forth the applicable law under the circumstances, then there is no reversible error. State v. Wilbely, 63 N.J. 420, 422 (1973). Further, it is well established that "imperfect self-defense" is not an independent category of justification. Bowens, supra, 108 N.J. at 626. However, evidence that demonstrates an imperfect self-defense may be relevant in determining whether defendant acted purposely, knowingly or recklessly. State v. Pitts, 116 N.J. 580, 606 (1989).

> In State v. Rivers, the companion to Bowens, the supreme Court held that the trial court properly

_____

[2] Under New Jersey law of self-defense, "the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." N.J.S.A. 2C:3-4 (a) (emphasis added). The concept of "imperfect self-defense" refers to an honest but unreasonable belief that one must use force to defend himself from an imminent attack. See State v. Bowens, 108 N.J. 622, 628 (1987).

refused to instruct on imperfect self-defense because
there were alternate charges of murder, reckless
manslaughter, and aggravated manslaughter. <u>Bowens</u>,
<u>supra</u>, 108 N.J. at 637. ...

    Here, the judge first instructed the jury on self-
defense. Then the judge charged the elements of
murder. As a lesser-included offense, the judge
charged aggravated and reckless manslaughter. During
the charge on aggravated manslaughter, the judge said:

>     Now, remember here, in terms of recklessness,
> and again I give you by way of instruction -- and
> your recollection of the facts is what controls,
> but we're talking about the shooting that night on
> the corner. You heard the State's testimony
> through witnesses and experts. You heard the
> Defense's case through cross-examination, and of
> all of those witnesses, and you know the positions
> of both.
>
>     The recklessness that we are speaking about
> is the firing of the handgun under consideration
> that night.

Because defendant admitted firing the handgun at the
Acura, the critical issue in this case was
justification. The State took the position that
defendant acted purposely or knowingly. Defendant
argued that he was not guilty because he acted in self-
defense. The judge gave the jury two additional
choices, aggravated manslaughter and reckless
manslaughter. The four possible choices turned on the
jury's assessments of defendant's justification by way
of self-defense. In that context, we are satisfied
that the judge's instructions conveyed to the jury the
concept that if defendant's conduct was motivated by an
unreasonable but honest belief that he needed to shoot
in order to save himself, he was acting recklessly.
The jury obviously found that defendant was not acting
recklessly but knowingly or purposely. We perceive no
error in the jury charge capable of producing a
different result.

(Resp. Ex. 6 at 8-10.)

As explained by the Appellate Division, New Jersey does not recognize imperfect self-defense as a justification to homicide, but does permit evidence of imperfect self-defense to be admitted as probative of the <u>mens</u> <u>rea</u> element of homicide.   <u>See generally</u>, <u>Bowens</u>, 108 N.J. 622.   Where, as here, the trial court instructs the jury on the various levels of homicide and permits consideration of evidence on a defendant's honest but unreasonable belief in the need for deadly force, the instructions conform to state law.   <u>Bowens</u>, 108 at 636-37.   There is no error in the instructions.   Petitioner is not entitled to relief on this claim.

B.   <u>Prosecutorial Misconduct</u>

Petitioner contends that he was deprived of a fair trial by the prosecutor's use of terms such as "I guess," "my comments," and "I promise," and by the prosecutor's sharing with the jury of his personal beliefs about the evidence.

The U.S. Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor -- indeed, he should do so.   But, while he may strike hard blows, he is not at liberty to strike foul ones.   It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. ...   Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

14

Berger v. United States, 295 U.S. 78, 88 (1935). "The line
separating acceptable from improper advocacy is not easily drawn;
there is often a gray zone. Prosecutors sometime breach their
duty to refrain from overzealous conduct by commenting on the
defendant's guilt and offering unsolicited personal views on the
evidence." United States v. Young, 470 U.S. 1, 7 (1985).

> The prosecutor's vouching for the credibility of
> witnesses and expressing his personal opinion
> concerning the guilt of the accused pose two dangers:
> such comments can convey the impression that evidence
> not presented to the jury, but known to the prosecutor,
> supports the charges against the defendant and can thus
> jeopardize the defendant's right to be tried solely on
> the basis of the evidence presented to the jury; and
> the prosecutor's opinion carries with it the imprimatur
> of the Government and may induce the jury to trust the
> Government's judgment rather than its own view of the
> evidence.

Id. at 18.

Under U.S. Supreme Court precedent, where a prosecutor's
opening or closing remarks are challenged in habeas, "[t]he
relevant question is whether the prosecutor's comments 'so
infected the trial with unfairness as to make the resulting
conviction a denial of due process.'" Darden v. Wainwright, 477
U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S.
637 (1974)). In evaluating the likely effect of improper
comments, a court may consider whether the improper comments were
invited by or responsive to prior comments by opposing counsel.
Darden, 477 U.S. at 181-82. Thus, "Supreme Court precedent
counsels that the reviewing court must examine the prosecutor's

offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

The Appellate Division rejected Petitioner's claim of prosecutorial misconduct.[3]

> In any event, a prosecutor is afforded leeway, within reasonable limitation, in his or her opening statements and summation. State v. Lofton, 146 N.J. 294, 386 (1996). Here, the prosecutor's comments during opening and closing statements were merely assertions as to what he intended to prove, and what the State in fact proved during the course of the trial. Fairly, read, the remarks can hardly be characterized as an expression of her personal belief in defendant's guilt. State v. Adams, 50 N.J. 1, 5 (1967). Moreover, the prosecutor's comments during summation were legitimate responses to defense counsel's own arguments, State v. Shelton, 344 N.J. Super. 505, 519 (App. Div. 2001), and were confined to the facts adduced during trial and reasonable inferences to be drawn from the evidence. State v. Frost, 158 N.J. 76, 85 (1999). Finally, even if we were to deem any of the comments improper, they were not so egregious as to deprive defendant of a fair trial. State v. Ramseur, 106 N.J. 123, 322 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).

(Resp. Ex. 18 at 6, Appellate Division, Nov. 21, 2002.)

Here, the Appellate Division correctly identified the principles governing a claim of prosecutorial misconduct in

---

[3] The Appellate Division, besides addressing this claim on the merits, found it to be procedurally defaulted. (Resp. Ex. 18.) Because this claim can be denied on the merits, this Court need not determine whether it was procedurally defaulted. See 28 U.S.C. § 2254(b)(2).

opening and closing statements.  The Appellate Division correctly
found that nowhere in the opening and closing statements did the
prosecutor suggest to the jurors that he held personal knowledge
of Petitioner's guilt.  To the contrary, the prosecutor
emphasized that the evidence in the case would come from
witnesses, not from counsel.

> How will the facts be told?  Well, they are not
> going to be told by me.  As Judge Callahan told you,
> what I say is not evidence in this case.  It's not
> going to be told to you by [defense counsel] Mr. Young,
> because as the Judge told you, what Mr. Young says is
> not evidence in the case.  It's going to come to you
> from the witness stand.

(Resp. Ex. 25 at 8, Transcript of Feb. 25, 1997, Opening
Statements.)

> How do we go about putting pieces of a puzzle together?
> We look for cornerstones.  And I told you in my opening
> that my case was going to be proven to you not just by
> the witnesses at the scene, I told you they will be,
> and I tell you now they are cornerstones, but it is
> their testimony, the police testimony, the medical and
> scientific testimony, and it is his words which will
> enable us to put the puzzle together.

(Resp. Ex. 31 at 40, Transcript of March 6, 1997, Closing
Statements.)  After this beginning, the prosecuting attorney
proceeded to summarize and characterize the testimony of the
various witnesses.

In addition, the court emphasized both before and after the
prosecutor's closing statement that the jurors' recollections,
not the attorneys' statements, controlled.  (Resp. Ex. 31 at 3,
71, Transcript of March 6, 1997, Closing Statements.)

17

The Appellate Division correctly found no unfairness in the prosecutor's comments.  Petitioner is not entitled to relief on this claim.

C.   Ineffective Assistance of Counsel

Petitioner contends that his trial counsel was ineffective in (1) failing to take an interlocutory appeal of the decision to prosecute the juvenile Petitioner as an adult, (2) failing to move to suppress Petitioner's custodial statement, (3) failing to demonstrate that Petitioner was incompetent, and (4) failing to present a diminished capacity defense.

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  The right to counsel is "the right to _effective_ assistance of counsel."  McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different.  Strickland v. Washington, 466 U.S. 668, 687, 694 (1984).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  Strickland at 694.

18

Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." Id. at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91. If counsel has been deficient in any way, however, the habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of Strickland. See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

After correctly identifying <u>Strickland</u> as the governing law, the trial court rejected Petitioner's claims of ineffective assistance of counsel.[4]

> Counsel for petitioner argues that defendant's previous counsel was less than sufficient at the time of the juvenile waiver hearing and during the trial. specifically, counsel argues that because no appeal was filed on the waiver by petitioner's previous counsel, this constitutes per se ineffective assistance.
>
> Rule 5:22-2 is the rule wherein a juvenile may be referred to another court without their consent if all of the requirements provided within the rule are met. It provide[s] in pertinent part that:
>
>> "The Court shall waive jurisdiction of a juvenile delinquency action without the juvenile's consent and shall refer the action to the appropriate court and prosecuting authority having jurisdiction only upon the following findings:
>> (2) The juvenile was 14 years of age or older at the time of the alleged delinquent act. Defendant was here.
>> (2) There's probable cause to believe he committed the act or acts which if committed by an adult would constitute criminal homicide.  And certainly these facts are within.
>> (3) That the juvenile has failed to show that the probability of rehabilitation prior to reaching the age of 19 by the use of the procedures, services and facilities available to the court would substantially outweigh the reasons for waiver.
>
> Now, defense counsel asserts that petitioner's trial counsel should have made

---

[4] The PCR court found certain of the ineffective assistance of counsel claim to be procedurally defaulted, but also addressed each of them on the merits.  <u>See</u> Resp. Ex. 36 at 25.   The Appellate Division did not address the question of procedural default.  <u>See</u> Resp. Ex. 18.)  Because the claims are meritless, this Court need not address the issue of procedural default.  <u>See</u> 28 U.S.C. § 2254(b)(2).

an interlocutory appeal on the decision of
Judge Bovino to try the defendant in adult
court.  However, I fail to see any evidence
set forth in support of this contention which
the juvenile court and previous counsel did
not have before them at the time that the
matter was resolved.

Upon reviewing the transcript of the juvenile
waiver hearing, it's clear that the judge considered
all the evidence presented to him, including the
testimony of Dr. Silikovitz.  Having heard the
testimony of Dr. Silikovitz, and also the testimony of
State's witnesses Andrew White and Edward McMara or
McManna, the judge rejected the petitioner's finding
and he held, Judge Bovino did, on page 38, line 19
through 25, and at page 39, 1 to 5, quot, "I will
reject the finding of Dr. Silikovitz that Raheem Pak
could be rehabilitated by the age of 19, or
substantially rehabilitated by the age of 19.  I'm
satisfied that based upon the nature , circumstances of
the offense, his prior record, the needs and protection
of society and the community, all of which are
appropriate factors to consider in balancing the
application for referral...there is a presumption of
waiver...I'm satisfied," the judge goes on, "that
Raheem Pak cannot be rehabilitated, and that therefore,
the matter should be referred to the Prosecutor's
Office for presentation to the Grand Jury and
processing in accordance therewith."

Now without more or greater evidence, it should
not be determined that petitioner's previous tactical
decision not to appeal amounts to ineffective
assistance, or that this petitioner was either
prejudiced by counsel or the Court's decision to waive
the matter from juvenile court.  In short, defense
counsel below was not deficient, because he had no
reason to appeal the decision.

I've looked through the decision.  I've reviewed
it and rereviewed it.  I now have the benefit of seeing
what happened during the trial in this court. ...

... there's nothing below that would indicate
that what was done by Judge Bovino was not appropriate,
arguments of petitioner's counsel notwithstanding.

21

Counsel for petitioner has made much about the fact that an appeal was not filed, but although it's clear that an appeal is not a matter of right to be filed each time simply to file it, there's got to be some justiciable issue that at first glance at last prima facie indicates that there's an issue that should be or could be overturned, and that just is not here in this particular case.

The appeal at that point in time interlocutory could have been filed but counsel for defendant did not file it, and it is reasonable to assume that he did not file it because there was no justiciable issue.  He had raised it below, and certainly Judge Bovino was extensive in his findings in the entire hearing, and so that point fails.

As to the next point, counsel for petitioner next asserts that trial counsel should have moved to suppress the evidence of the defendant's statement to the police because his mother was not present.

... There is no question that in reviewing, this Court had the ability during the course of the trial to review the procedures that have gone forth.  There is no question that the defendant was, his mother was present.  the State acknowledged he was juvenile. There was a signing of the waiver form.  The mother was not with him when the statement was being taken, and the statement is as much exculpatory as it is inculpatory.  Certainly, it puts the defendant at the scene.  Certainly puts the gun in the defendant's hand. But it also raises the very issue that defense counsel relied on during the course of the trial, and that is self defense.  Whether it be perfect self defense, imperfect self defense which came forth before the jury by the very nature of the statement itself, wouldn't have come before the jury in any other manner except for the witnesses who are hearsay, or the defendant testifying himself.

And, so consequently, when one looks at the statement, one could say that it would not be appealed for the matter of trial strategy, as well as it could be for ineffective assistance.  Quite the contrary. The defendant, during the course of this trial, was able to put forth every single issue that he wanted to put forth before the jury, and wasn't cross-examined on

22

it as the statement was played.  That can be
considered, and I do consider it as a trial tactic and
not an ineffective assistance that would have changed
the outcome of the trial.

    ... There's no prima facie showing, therefore, as
to this issue of ineffective assistance required. ...
It appears as though the petitioner's mother was not
present at the time of the statement.  She could have
been present, chose not to do so.  Prior to the
statement, she and her son had gone through the Miranda
rights form together.  As such, counsel was not
deficient because he was aware that, based upon these
facts, the issue did not rise to the level of
suppression.

    Petitioner also points to the trial as the next
point, the trial counsel should have set forth a
defense of diminished capacity, or at least put the
psychiatric history before the jury or explored it as
to incompetency.  It was done, I believe.  We do have
Dr. Silikovitz testifying before the juvenile waiver
hearing judge.  Counsel for the defense then did have
the benefit of this testimony as to any mental defects.
It remains clear that at the waiver hearing Dr.
Silikovitz set forth his belief that the petitioner was
aware of the nature of his actions at the time this
occurred.

    Based upon this assertion, petitioner fails to
allege any facts that give rise to the level requested.

    Is the defendant's I.Q. on the low range,
certainly it is.  Would he have learning difficulties
and disabilities, certainly he would.  Is he at the
level of mental retardation, no.  Was the issue
addressed, yes.  If the petitioner was before me today,
and there has never even been a mention of the prior
history or a doctor took a look at it or any appealing
from the court below, maybe the argument would have
greater merit.  But as it exists today, the defense
attorney was not successful in the waiver hearing and
went forward and tried the case on trial strategy, and
simply because trial strategy results in a conviction
of the most serious counts of the indictment doesn't
mean that the trial strategy was wrong.

This case was tried well.  There was great
exploration of all issues that came before the Court.
The appellate court has reviewed this matter, as I
review it, and as I go through the entire trial, issues
were addressed and raised, and I don't believe that
there's any showing of ineffective assistance of
counsel that even a prima facie case has been made.

(Resp. Ex. 36 at 22-31, Transcript of PCR Hearing, Feb. 1, 2001.)

The Appellate Division affirmed the denial of relief.

Judge Callahan gave a thorough oral opinion
rejecting these points.  He noted that he was
"extremely familiar" with the case; he had read the
entire transcript of the waiver hearing and was the
trial judge during the criminal prosecution.  He
determined that trial counsel had no legal or factual
basis to have appealed the waiver to the Criminal
Division.  ...  The judge further concluded that defense
counsel probably did not move to suppress defendant's
statement because the statement was essentially
exculpatory; it supported defendant's central theory of
self-defense without having to put defendant on the
stand to testify.  Thus, the reasonable strategic
choice not to suppress the statement could not be
challenged as ineffective assistance of counsel. ...

Lastly, Judge Callahan rejected the claim that
trial counsel should have advanced a diminished
capacity defense.  During the waiver hearing, Dr.
Silikovitz testified on behalf of the juvenile that he
had an IQ of seventy-three and suffered from conduct
disorder, borderline intellectual functioning and
developmental reading disorder.  but the judge noted
Dr. Silikovitz also stated that, at the time of the
criminal episode, defendant was fully aware of the
nature of his actions and in fact regretted what he had
done.  No other evidence was adduced during the waiver
hearing demonstrating a basis for a diminished capacity
defense under N.J.S.A. 2C:4-2.  There was no suggestion
that defendant's limited intelligence was a mental
condition that interfered with the formation of the
requisite mental state required for a purposeful or
knowing murder conviction. ...  Indeed, the manner by
which defendant committed the murder suggested
otherwise.  Absent some specific facts supporting the
probability that the diminished capacity defense would

24

have resulted in a finding that defendant did not act purposely, defendant fails to satisfy the prejudice prong under <u>Strickland</u>. ...

(Resp. Ex. 18 at 4-5, Appellate Division, Nov. 21, 2002.)

Here, the state courts correctly identified <u>Strickland</u> as the governing federal law. The state courts' conclusions that Petitioner failed to establish either the performance or prejudice prongs of <u>Strickland</u> is neither contrary to nor an unreasonable application of <u>Strickland</u>. Accordingly, Petitioner is not entitled to relief on this claim.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  <u>Miller-El v. Cockerel</u>, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Accordingly, no certificate of appealability shall issue.

25

V.   CONCLUSION

For the reasons set forth above, the Petition must be denied.   An appropriate order follows.

_____
Joel A. Pisano
United States District Judge

Dated:  5/16/06

26